**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
|     SCOTT W. TYSON | : | |
|     JEANNE M. TYSON, | : | |
| | : | Bky. No. 08-18521 ELF |
|     Debtors. | : | |
| | : | |
| JOSEPH J. BANNON, Sr., | : | |
| | : | |
|     Plaintiff, | : | Adv. No. 09-0093 |
| | : | |
|     v. | : | |
| | : | |
| SCOTT W. TYSON | : | |
| JEANNE M. TYSON, | : | |
| | : | |
|     Defendants. | : | |

# M E M O R A N D U M

## I. INTRODUCTION

On December 30, 2008, Jeanne M. Tyson ("Mrs. Tyson") and her husband, Scott W. Tyson ("Mr. Tyson"), filed a joint petition under chapter 7 of the Bankruptcy Code. The case was administered as a no-asset case and Mr. and Mrs. Tyson received their chapter 7 discharge on April 29, 2009.

On March 30, 2009, prior to the entry of the discharge order, Mrs. Tyson's brother, Joseph J. Bannon, Sr. ("Mr. Bannon"), timely filed an adversary complaint seeking a determination that a debt arising out of Mrs. Tyson's conduct as attorney-in-fact for their now-deceased mother, should be excepted from the Debtors' discharge pursuant to 11 U.S.C.

§523(a)(3) and (a)(4).[1]  Mr. Bannon also objected to the Debtors' discharge under 11 U.S.C. §727(a)(4).[2]

Trial in this proceeding was held on October 5, 2010.  The parties were offered the opportunity to submit post-trial memoranda in support of their respective positions.  Mr. Bannon filed two memoranda of law, one on October 7, 2010 and the other on November 16, 2010.   Mr. and Mrs. Tyson did not file a post-trial memorandum.

For the reasons set forth below, I will enter judgment in favor of the Defendants, Mr. and Mrs. Tyson, and against the Plaintiff, Mr. Bannon, on all of the claims raised in the Complaint.

## II.  FINDINGS OF FACT

After consideration of the testimony presented at trial, the documentary evidence, the pleadings, Mr. Bannon's post-trial submissions, and based upon my assessment of the credibility of the testifying witnesses,[3] I make the following findings of fact:

---

[1] See Fed. R. Bankr. P. 4007(c) and Bky. No. 10-18521 (Docket Entry No. 13).

[2] Because Mr. Bannon filed an objection to discharge, the Debtors' discharge should not have been entered on April 29, 2009, while this adversary proceeding was pending.  The error appears to have occurred because Mr. Bannon docketed the Complaint as a §523(a) dischargeability proceeding without any reference to the §727(a) objection to discharge.  (See Adv. No. 09-093, Docket Entry No. 1). As explained below, the premature entry of the discharge order has proven to be harmless.

[3] To the extent the witnesses at trial offered conflicting testimony on issues relevant to the disposition of this adversary proceeding, my findings of fact reflect my resolution of those conflicts based on my assessment of the witnesses' demeanor, motivations, credibility, and related factors.

**the parties' relationships**

1. Mr. and Mrs. Tyson are married and reside together at 4139 Whiting Place, Philadelphia, PA 19154.

2. Mrs. Tyson and Mr. Bannon are brother and sister.

3. Jeanne T. Bannon ("Mrs. Bannon") was the mother of Mrs. Tyson and Mr. Bannon.

4. Mrs. Bannon died on May 2, 2007.

5. After Mrs. Bannon's death, Mrs. Tyson was appointed as executrix of Mrs. Bannon's decedent's estate.

**Mrs. Bannon's income, assets and estate plan**

6. In 2004, Mrs. Bannon purchased the residential property located at 1014 Bloomfield Avenue, Philadelphia, PA ("the Property").

7. Mrs. Bannon resided with Mr. and Mrs. Tyson at the Property until her death in 2007.

8. Mrs. Bannon owned an Annuity/IRA issued by ING USA Annuity and Life Insurance Company ("the ING Account") with a value of approximately $220,000.

9. Mrs. Bannon owned a second retirement account, that was managed by an entity referred to at trial as "Commonwealth," which had a value of approximately $150,000.

10. During her lifetime, Mrs. Bannon received income from these retirement accounts, which she used to pay her living expenses.

11. While residing at the Property, Mrs. Bannon maintained a joint bank account ("the Joint Account") with Mr. and Mrs. Tyson, which was used to pay joint household expenses.

12. Mrs. Bannon contributed to the Joint Account, as did Mr. and Mrs. Tyson.

13. In an apparent effort to carry out an estate plan, Mrs. Bannon

    a. titled the Property jointly, naming Mr. and Mrs. Tyson as co-owners on the deed with the right of survivorship; and

    b. named Mr. Bannon (80%) and Mr. Bannon's two adult children (10% each, 20% total) as the beneficiaries of both retirement accounts upon her death.[4] (Ex. P-4).

14. Thus, Mrs. Bannon decided to leave her real estate to one child (Mrs. Tyson) and her retirement accounts to her other child (Mr. Bannon) and his children (her grandchildren).

15. After Mrs. Bannon's death, Mr. Bannon and his children received approximately $366,000.00 as a result of their distributions from the two retirement accounts.[5]

16. On March 31, 2008, about eleven months after Mrs. Bannon's death, Mr. and Mrs. Tyson sold the Property for $340,000.00.

17. At the time of sale, the Property was encumbered by two mortgages with a combined payoff in excess of $330,000.00.

18. As a result of transaction costs and settlement charges, Mr. and Mrs. Tyson received no proceeds from the sale of the Property. In fact, in order to complete the transaction, they were compelled to pay $15,302.23 at closing. (Ex. D-1).

---

[4] Mr. Bannon's adult children are not parties to this proceeding. Therefore, any nondischargeability claims they may have had against Mrs. Tyson are now time barred. See n.1, supra. It appears, therefore, that the value of Mr. Bannon's claim against Mrs. Tyson is limited to 80% of $20,000.00, or $16,000.00.

[5] Mr. Bannon testified that, before his mother died, he was aware he was the beneficiary of some account of hers, but he did not know any details. He stated that he was first notified of his entitlement five months after his mother's death by Mrs. Tyson's attorney.

### **the power of attorney**

19. In August, 2006, due to failing health, Mrs. Bannon decided to appoint Mrs. Tyson as her attorney-in-fact.

20. Mrs. Tyson agreed to serve as her mother's attorney-in-fact.

21. Mrs. Bannon executed a power of attorney ("the POA") on August 17, 2006. (Ex. P-3).

22. Mrs. Tyson was present when her mother signed the POA.

23. The POA provided Mrs. Tyson with authority to act on Mrs. Bannon's behalf in connection with, inter alia:

   a. authorization for medical treatment;

   b. "all actions relating to my bank accounts, certificates of deposit and all my other financial matters;" and,

   c. all of the powers granted to an attorney-in-fact by Chapter 56 of the Decedents, Estates and Fiduciaries Code.

(Ex. P-3 at 1).

24. The POA further provided that:

   a. it was effective upon Mrs. Bannon's "disability or incapacity;" and,

   b. Mrs. Bannon "shall be deemed to be under disability or incapacity upon written certification by my normally attending physician that I am under disability or incapacity."

(Id. at 1-2).

25. Mrs. Tyson was aware that she was to exercise her powers under the POA only upon her mother's incapacity or disability.

## the events at the time of Mrs. Bannon's death in May 2007

26. In 2007, Mrs. Bannon was admitted to the hospital and became gravely ill.

27. On April 28, 2007, a Saturday four days before before Mrs. Bannon's death, Mrs. Tyson visited her mother in the hospital. During that visit, Mrs. Bannon said that she knew that she was dying and instructed Mrs. Tyson to withdraw money out of the ING Account to pay for the funeral expenses.[6]

---

[6] Whether Mrs. Bannon expressly authorized the withdrawal of the funds from the ING Account was a central factual issue at trial. In disputing his sister's account of the events, Mr. Bannon testified that he visited his mother at the hospital on the day of her death, May 2, 2007, but that she was already unconscious. He further testified that Mrs. Tyson was present during that visit, but that she never mentioned anything to him regarding their mother's instructions to withdraw the funds from the ING Account. Mrs. Tyson did not dispute Mr. Bannon's testimony on that point. Mr. Bannon asks me to infer, from Mrs. Tyson failure to mention to him the prior conversation with their mother and the ING withdrawal request while they were both at the hospital on the day she died, that the prior conversation never occurred.

After due consideration, I believe Mrs. Tyson's account.

I find it credible that Mrs. Tyson's mother, sensing her impending death, sought to finalize her affairs and, in particular, desired not to burden her daughter financially with her funeral expenses. Then, Mrs. Tyson, reacting to the crisis, hastily withdrew the funds from the ING account for use to cover the funeral expenses. Also supporting this determination is the inference I draw from the evidence (which was not extensive regarding the relationship among the family members) that Mrs. Tyson had a closer relationship to her mother in the time in question (through their living arrangements) and arguably was more informed of her mother's intentions and desires than her brother.

While I accept the undisputed fact that Mrs. Tyson did not mention her prior conversation with Mrs. Bannon to her brother while they were both at the hospital on May 2, 2007, I decline to draw the inference requested by Mr. Bannon. There are many reasons why she would not have discussed financial issues of that nature with her brother during that undoubtedly difficult and emotional day. Therefore, I do not consider her silence to be so inconsistent with her assertion that her mother authorized her to access the ING Account as to warrant disbelieving her testimony regarding her April 28th conversation with her mother.

Finally, I note that Mr. Bannon has asserted only that Mrs. Bannon did not authorize the withdrawal from the ING Account. He has not asserted that Mrs. Bannon was either incompetent or the subject of undue influence or duress four days before her death, when Mrs. Tyson says that Mrs. Bannon instructed her to withdraw the funds.

28. On the morning of May 2, 2007, the day her mother died, Mrs. Tyson obtained and completed the required written form for withdrawing money from her mother's ING account.

29. Mrs. Tyson did not obtain a certification of disability or incapacity from Mrs. Bannon's doctor, as required by the POA, before exercising her authority as attorney-in-fact under the POA.[7]

30. Mrs. Tyson withdrew $20,000.00 from the ING account.

31. Of the $20,000.00 withdrawn from the ING account, Mrs. Tyson received $16,000.00, with the remaining withheld for taxes.

32. Mrs. Tyson received the $16,000.00 after Mrs. Bannon's death. She deposited the money into the Joint Account.

33. Mrs. Tyson used the $16,000.00 to reimburse herself for the expenses she had advanced, using her credit cards, related to her mother's funeral.[8]

---

[6](...continued)

[7] I do not specifically recall any evidence expressly establishing that Mrs. Tyson used the POA as authority when she made the withdrawal request to ING. If there was no such express evidence, I infer from the circumstances that she did so.

[8] Mrs. Tyson testified that before she deposited the ING funds into the Joint Account, she had already paid approximately $10,000 to the funeral home. According to her testimony, the remaining $6,000,00 was used to pay credit card bills she had incurred to cover other expenses related to the funeral.

Mr. Bannon testified that he had not discussed with his mother her plans regarding funeral expenses. He further testified, however, that he believed the expenses had been "pre-arranged." He explained that he understood that his mother had already paid for her funeral. Consequently, he expressed his belief that Mrs. Tyson used the ING funds for her own personal needs, not for funeral expenses.

(continued...)

34. In withdrawing the $16,000.00 from the ING Account and spending those funds, Mrs. Tyson did not act with fraudulent intent.

**Mr. Bannon's assertion of his claim pre-petition**

35. On October 22, 2008, Mr. Bannon filed a Petition for Citation in the Court of Common Pleas, Philadelphia County, Orphans' Court Division ("the State Court Petition").

36. In the State Court Petition, Mr. Bannon requested that Mrs. Tyson be required to account for the money withdrawn from the ING Account.

37. Mrs. Tyson's attorney, Harvey Iseman ("Mr. Iseman"), accepted service of the State Court Petition on November 6, 2008. (Ex. P-7).

**the bankruptcy filing**

38. Mr. and Mrs. Tyson have been represented in the chapter 7 bankruptcy case by Paul H. Young of the law firm Young, Klein & Associates ("YKA").

39. Mr. and Mrs. Tyson have been represented in other matters, including this adversary

---

[8](...continued)
I resolve this disputed factual issue in Mrs. Tyson's favor.

As stated in Part III.,A. below, Mr. Bannon has the burden of proof. He did not meet his burden insofar as he had the ability, through discovery, to obtain evidence that would have enabled him to follow the paper trail with respect to the disposition of the $16,000.00 that Mrs. Bannon received and to establish that it was not used for funeral expenses. Therefore, he did not overcome Mrs. Tyson's credible testimony on the subject.

Further, the only documentary evidence in the record supports Mrs. Tyson's version of the events. Exhibit P-6 is a bill from the funeral home and it shows a $10,470.00 payment received from Mrs. Tyson on May 3, 2007, the day after Mrs. Bannon's death and before Mrs. Tyson's receipt of the $16,000.00 from the ING Account. Payment to the funeral home on the day after Mrs. Bannon's death is not consistent with Mr. Bannon's theory that her funeral expenses were prearranged (i.e., prepaid).

-8-

proceeding, by Mr. Iseman.

40. Mr. and Mrs. Tyson first met with a YKA attorney in September 2008 and at that time supplied their bankruptcy attorney with information related to their financial affairs.

41. In the interim between Mr. and Mrs. Tyson's September 2008 meeting with YKA and the filing of their bankruptcy case, Mr. Bannon filed and served the State Court Petition.

42. In September 2008, when they provided their personal financial information to their bankruptcy attorney, Mr. and Mrs. Tyson were unaware of Mr. Bannon's claim arising from the withdrawal of the $20,000.00 from the ING Account.

43. Mr. and Mrs. Tyson did not disclose the pending State Court Petition in Paragraph 10 of their Statement of Financial Affairs[9] and did not schedule Mr. Bannon as a creditor in their bankruptcy schedules that were filed in the bankruptcy court.

44. Mr. and Mrs. Tyson's nondisclosures described in Finding of Fact No. 43 above, occurred due to negligence and oversight in not updating their financial information between September 2008 and the filing of their bankruptcy petition on December 30, 2008, not due to any fraudulent intent.

---

[9] Paragraph 10 of the Statement of Financial Affairs instructs, in pertinent part: "List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."

## III.  DISCUSSION

Mr. Bannon invokes two (2) subsections of section 523(a) in support of his position that Mrs. Tyson's withdrawal of the $20,000.00 from the ING Account is nondischargeable:[10] He asserts that his claim is nondischargeable under 11 U.S.C. §523(a)(3) due to the Debtors' failure to list or schedule the debt.  He also asserts that his claim is nondischargeable under 11 U.S.C. §523(a)(4) based upon three separate legal theories: (1) fraud while acting in a fiduciary capacity; (2) defalcation while acting a fiduciary capacity and (3) embezzlement.[11]

### A.

Mr. Bannon's nondischargeability claim under 11 U.S.C. §523(a)(3) requires little discussion.

---

[10] Mr. Bannon's post-trial submissions do not reference his objection to discharge under 11 U.S.C. §727(a)(4).  Section 727(a)(4)(A) provides for the denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  I take Mr. Bannon's post-trial silence to be an abandonment of the objection to discharge.  But, even if the objection to discharge has not been abandoned, I have found that the omissions from the Debtors' schedules were not made fraudulently.  Consequently, I will enter judgment in the Debtors' favor on this claim.  This is not to condone the carelessness of both the Debtors and their bankruptcy counsel in failing to update and properly review for accuracy the financial disclosures prepared in September 2008 before filing them with the court in December 2008.  However, I find the conduct does not rise to the level of a knowing and fraudulent false oath.

[11] The Complaint names both Mr. and Mrs. Tyson as defendants.  However, all of the allegations in the Complaint relating to the §523(a)(4) claim, as well as all of the evidence at trial, related to the conduct of Mrs. Tyson only.  In the absence of any evidence connecting Mr. Tyson to the underlying debt, Mr. Tyson is entitled to judgment in his favor on Mr. Bannon's §523(a)(4) nondischargeability claim.  See In re Antonious, 358 B.R. 172, 184 (Bankr. E.D. Pa. 2006) (under §523(a)(2)(A), "[a]s a general rule, fraudulent practices of one spouse are not automatically imputed to the other spouse for purposes of nondischargeability"); see also In re Tsurukawa, 258 B.R. 192, 198 (B.A.P. 9th Cir. 2001) (same).  This Memorandum will contain no further discussion of the §523(a)(4) claim against Mr. Tyson.

Section 523(a)(3) provides that a debt is excepted from discharge if it is:

> neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit —
>
> > (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or
> >
> > (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request . . . .

Mr. Bannon's nondischargeability claim satisfies neither subsection (A) nor subsection (B) of §523(a)(3).

Subsection (A) cannot be satisfied because the Debtors' bankruptcy case was a no-asset case in which no deadline was set for the filing of proofs of claim. See Judd v. Wolfe, 78 F.3d 110, 114 (3d Cir. 1996) ("Because this is a "no-asset" Chapter 7 case, the time for filing a claim has not, and never will, expire unless some exempt assets are discovered; thus, section 523(a)(3)(A) cannot be applied . . . .").

Subsection (B) is inapplicable because Mr. Bannon had actual knowledge of the Debtors' bankruptcy case in time to permit the timely filing of this adversary proceeding raising his claim of nondischargeability under §523(a)(4).

**B.**

I turn next to Mr. Bannon's three theories of nondischargeability under 11 U.S.C. §523(a)(4).

**applicable legal principles**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). This exception to discharge subdivides into two (2) parts. Nondischargeability based on fraud or defalcation requires proof that the debtor was acting in a fiduciary capacity. Nondischargeability based on embezzlement or larceny does not. E.g., Alan N. Resnick & Henry J. Sommer (eds.), 4 Collier on Bankruptcy ¶523.10[1][d], at 523-72 (16th ed. 2010) ("Collier"); In re Hatch, 2009 WL 3208694, at * 5 (Bankr. E.D. Pa. Sept. 30, 2009).

To prevail under the fiduciary prong of § 523(a)(4), a plaintiff must prove that (1) the debtor was acting in a fiduciary capacity; and (2) while acting in that capacity, the debtor engaged in fraud or defalcation. E.g., In re Marques, 358 B.R. 188, 194 (Bankr. E.D. Pa. 2006). In the context of §523(a)(4), "fraud" involves "intentional deceit, rather than implied or constructive fraud." E.g., In re Youngblood, 2009 WL 1232103, *10 (Bankr. S.D.Tex. Apr. 29, 2009); In re Tripp, 189 B.R. 29, 35 (Bankr. N.D.N.Y. 1995).

To prove a debtor committed embezzlement within the meaning of § 523(a)(4), a plaintiff must establish that: (1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor appropriated for his own use; and (5) with fraudulent intent. E.g., Hatch, 2009 WL 3208694, at *6.

Generally, in proceedings to determine the dischargeability of a debt, the burden of proof is on the creditor to prove the elements of the claim by a preponderance of the evidence. Byrnes v. King, 2010 WL 2733394 (Bankr. D.N.J. July 8, 2010); In re Enciso, 300 B.R. 235, 241 (Bankr. W.D. Pa. 2003); see also Grogan v. Garner, 498 U.S. 279, 286-87 (1991). This principle

applies to §523(a)(4) proceedings.  E.g., In re Baylis, 313 F.3d 9, 17 (1st Cir. 2002); In re Parks, 2007 WL 2033380, at *13 (Bankr. D.N.J. July 10, 2007); In re Jurewicz, 2003 WL 21493987, at *3 (Bankr. E.D. Pa. June 25, 2003).  But see In re Niles, 106 F.3d 1456, 1462 (9th Cir. 1997) (burden shifts to the debtor after creditor establishes debtor's fiduciary status).

Further, as the court recently observed in In re August, 2011 WL 1206146(Bankr. E.D. Pa. March 3, 2011), based on the interplay of 11 U.S.C. §§101(5)(A), 110(10), 110(12) and 523(a) :

> [E]very dischargeability proceeding involves two separate inquiries.  First, does the creditor hold an enforceable obligation under non-bankruptcy law.  Second, is the debt non-dischargeable under bankruptcy law, specifically § 523(a) . . . .  In the absence of an enforceable obligation, there is no "debt" that can be non-dischargeable.

August, 2011 WL 1206146, at *11 (quoting In re Roland, 294 B.R. 244, 249 (Bankr. S.D.N.Y. 2003)) (emphasis added).[12]

In evaluating Mr. Bannon's §523(a)(4) claim, I will assume arguendo that he holds a valid claim against Mrs. Tyson under Pennsylvania law for improperly withdrawing $20,000.00

---

[12]    The August court reasoned:

> Section 523(a) provides that certain "debts" are not dischargeable.  A debt is defined in section 101(12) as a "liability on a claim."  A "creditor" is an entity that has a claim against the debtor. 11 U.S.C. § 101(10).  And a claim means "a right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

2011 WL 1206146, at *11.

from the ING Account and I will consider only whether the claim is nondischargeable under

§523(a)(4).[13]

### §523(a)(4) - fiduciary fraud

Mr. Bannon asserts Mrs. Tyson was acting in a fiduciary capacity, within the meaning of 11 U.S.C. §523(a)(4) when she acted as attorney-in-fact and withdrew $20,000.00 from Mrs. Bannon's ING Account. See generally 20 Pa. C.S. §5601(e) ("An agent acting under a power of attorney has a fiduciary relationship with the principal"). Mrs. Tyson has not contested this proposition and I will accept it.[14]

---

[13]  In other words, I will assume that Mr. Bannon has a viable argument that Mrs. Tyson, in her capacity as attorney-in-fact, lacked the authority under the POA to withdraw the $20,000.00 from the ING Account, thus giving rise to a valid claim against her for the shortfall in the ING Account.

It is not obvious that this assumption is accurate, however.

Mr. Bannon assumes that his sister's withdrawal of the $20,000.00 was improper based upon the four corners of the POA. However, Mrs. Tyson does not justify her conduct by invoking the POA. She asserts that Mrs. Bannon gave her express, oral authority to withdraw the funds, independent of the POA. If Mrs. Bannon did so (as I have found as factual matter, see Finding of Fact No. 27 & accompanying n.7), the withdrawal of the funds may have been nothing more than Mrs. Bannon's intervivos disposition of her property, with Mrs. Tyson acting as her authorized agent (albeit, by convincing ING to release the funds from the ING Account through use of the POA, in a manner inconsistent with its terms). See First Colony Life Ins. Co. v. Gerdes, 676 N.W.2d 58 (Neb. 2004); see also Estate of Herbert v. Herbert, 152 S.W.3d 340 (Ct. App. Mo. 2004); Wabner v. Black, 7 S.W. 3d 379 (Ky. 1999). In response, the argument is available to Mr. Bannon that Mrs. Bannon's oral instruction to Mrs. Tyson was legally ineffective in light of the restrictions set forth in the POA. See Praefke v. Amer. Enterprise Life Ins. Co., (Wis. App. 2002); Fender v. Fender, 329 S.E.2d 430 (S.C. 1985). In my independent research, I could not locate any reported decisions in Pennsylvania that are conclusive on the issue.

As stated in the text, I will assume that Mr. Bannon holds a valid claim. Rather than decide this unclear state law issue, I will decide this case based on dispositive principles of federal bankruptcy law.

[14]  The term in §523(a)(4) "acting in a fiduciary relationship" is a determined by federal bankruptcy law, although state law is considered in the inquiry. Further, as stated by a leading treatise,
(continued...)

As stated earlier, a claim for fraud under §523(a)(4) requires proof of deceit, not implied or constructive fraud. The flaw in Mr. Bannon's theory is that he has not established that Mrs. Tyson acted with fraudulent intent. I have found that Mrs. Tyson acted at her mother's behest when she withdrew the funds from the ING Account. Even if the POA was invalid because it did not comply with statutory requirements as to form (as Mr. Bannon contends, see 20 Pa. C.S. §5601(c), (d)) or Mrs. Tyson otherwise acted outside the scope of the POA by invoking its authority without first obtaining the requisite medical certification, she intended neither to convert her mother's property for any purpose that was inconsistent with her mother's wishes nor to cheat Mr. Bannon of his rightful share of the ING Account. Rather, she subjectively believed that she was acting appropriately in carrying out her mother's wishes. Therefore, she lacked the requisite scienter for a determination of nondischargeability under the fiduciary fraud provision of §523(a)(4).[15]

---

[14](...continued)
> [A] technical trust relationship may be created by state statute or common law doctrines that impose trust-like obligations on a party sufficient to render the debtor a fiduciary within the meaning of section 523(a)(4). However, the mere fact that state law places two parties in relationship that may have some of the characteristics of a fiduciary relationship does not necessarily mean that the relationship is a fiduciary relationship under 11 U.S.C. § 523(a)(4), which requires the existence of express or technical trust.

4 Collier ¶523.10 (footnote omitted); see also In re Moran, 413 B.R. 168, 185-86 (Bankr. D. Del. 2009). There is legal authority in this Circuit for the proposition that an attorney-in-fact is a fiduciary within the meaning of §523(a)(4). See, e.g., In re Kishbaugh, 399 B.R. 419, 426 (Bankr. M.D. Pa. 2009).

[15] I point out again that this is not a case involving self-dealing by a fiduciary. I have found that Mrs. Tyson used the funds withdrawn from the ING Account for expenses that Mrs. Bannon wished to pay, not for her own general benefit.

### §523(a)(4) - defalcation

The nondischargeability of a debt for defalcation while acting in a fiduciary capacity was carried into the Bankruptcy Code from the prior Bankruptcy Act. See 11 U.S.C. §35(4) (repealed). Therefore, it may be somewhat surprising that no judicial consensus has emerged as to the meaning of the term "defalcation" in this context. The division in the case law has been summarized as follows:

> Three lines of authority have developed with respect to the contours of defalcation in section 523(a)(4). At one end of the spectrum is the view that an innocent mistake resulting in the failure to fully account for funds handled in a fiduciary capacity can constitute a defalcation. However, consideration of the principles that debts arising from breach of ordinary care and normally dischargeable in bankruptcy and that exceptions to discharge are strictly construed in favor of the debtor, some degree of culpability should be required to make a debt nondischargeable as a defalcation under section 523(a)(4). The second view is that defalcation requires negligent conduct on the part of the fiduciary. The third view is that defalcation requires reckless conduct by the fiduciary.

4 Collier ¶523.10 (footnotes omitted).

The Fourth, Eight and Ninth Circuits follow the "innocent mistake" line of cases. See In re Uwimana, 274 F.3d 806 (4th Cir. 2001); In re Cochrane, 124 F.3d 978 (8th Cir. 1997); In re Lewis, 97 F.3d 1182 (9th Cir. 1996).

In the Tenth Circuit, defalcation under §523(a)(4) appears to require that the debtor act negligently. See In re Storie, 216 B.R. 283 (B.A.P. 10th Cir. 1997).

The First, Second, Fifth, Sixth and Seventh Circuits require either reckless or extreme reckless conduct before defalcation by a fiduciary gives rise to a nondischargeable claim. See In re Patel, 565 F.3d 963 (6th Cir. 2009) ; In re Hyman, 502 F.3d 61 (2d Cir. 2007) , cert. denied, 129 S.Ct. 895 (2009); In re Baylis, 313 F.3d 9 (1st Cir 2002); In re Schwager, 121 F.3d 177 (5th

Cir. 1997); Meyer v. Rigdon, 36 F.3d 1375 (7th Cir. 1994).

  In this Circuit, the Court of Appeals has not addressed the issue, but several bankruptcy courts have weighed in on the debate and their decisions generally mirror the division among the Circuit Courts.  In a number of (mostly older) decisions, several courts stated that defalcation does not require proof of intent and that a failure to account due to a fiduciary's "ignorance" suffices to make out a defalcation claim under §523(a)(4).  See In re McCormick, 283 B.R. 680, 684 (Bankr. W.D. Pa. 2002); In re Kaczynski, 188 B.R. 770, 777-78 (Bankr. D.N.J. 1995); In re Specialty Plastics, Inc., 113 B.R. 915, 923 (Bankr. W.D. Pa. 1990), vacated in part, 127 B.R. 945 (W.D. Pa. 1991), aff'd 952 F.2d 1391 (3d Cir. 1991) (Table); In re Manzo, 106 B.R. 69, 72 (Bankr. E.D. Pa. 1989); In re Wolfington, 48 B.R. 920, 923  (Bankr. E.D. Pa. 1985).  More recent decisions, however, suggest that fiduciary defalcation requires some higher level of scienter.  See In re Stein, 2011 WL 1299985, at *5-6 (Bankr. D.N.J. April 4, 2011) (negligence alone is not sufficient; showing of "affirmative misconduct" is required);  In re Tamis, 398 B.R. 124, 131-32 (Bankr. D.N.J. 2008) (extreme recklessness); In re Parks, 2007 WL 2033380, at *16 (Bankr. D.N.J. July 10, 2007) (citing In re Ellenbogen, 218 B.R. 709 (Bankr. S.D.N.Y. 1998)) (recklessness).

  Mr. Bannon argues that I should follow the "innocent mistake" line of cases.  However, after reviewing the case law, I am persuaded by the reasoning of the decisions of Tamis, Parks and Ellenbogen, at least insofar as those decisions conclude that defalcation under §523(a)(4) requires some type of fiduciary misconduct beyond a showing of mere innocent mistake.  This adversary proceeding does not require that I define the scienter standard with any greater precision.  Therefore, I hold today only that fiduciary defalcation under §523(a)(4) requires some

showing of misconduct greater than innocent mistake and I leave a more precise definition of the scienter standard to another day.

Here, I have assumed that Mr. Bannon has a valid claim in that: (1) the POA governs; (2) Mrs. Tyson violated its terms by invoking her powers under the instrument without first obtaining a doctor's certification of her mother's incapacity; and, (3) Mrs. Tyson cannot account to the ING Account beneficiary (Mr. Bannon) for the money withdrawn from the account in a manner that was inconsistent with the POA.  However, Mr. Bannon's rights as a beneficiary are subordinate to the rights of his mother, the owner of the ING Account.  He was entitled only to the funds remaining in the account upon his mother's death.  What occurred here is that Mrs. Bannon's fiduciary, Mrs. Tyson, in the midst of a family crisis, carried out her mother's instruction to withdraw a modest portion of the ING Account to pay for the impending funeral expenses.  While Mrs. Tyson technically failed to comply with the strict requirements of the POA in carrying out her mother's wishes, I find that she did not act <u>knowingly or carelessly breach her fiduciary duty to her mother</u>.  In my judgment, Mrs. Tyson's conduct constituted nothing more than an innocent mistake and does not warrant excepting her debt to Mr. Bannon from discharge as a fiduciary defalcation under §523(a)(4).

### §523(a)(4) – embezzlement

Mr. Bannon briefly argues in his initial post-trial memorandum that Mrs. Tyson's actions "amounted to embezzlement."  He bases this claim on the allegation that she appropriated the $20,000.00 withdrawn from the ING Account "for her own use with fraudulent intent."

I have found, as a factual matter, that Mrs. Tyson acted at the behest of their mother, not

with fraudulent intent, and did not use the funds for her own benefit.  Therefore, this claim fails.

## IV.

For the reasons set forth above, I will enter judgment in favor of Mr. and Mrs. Tyson and against Mr. Bannon on all claims set forth in Mr. Bannon's complaint.  An appropriate order will be entered.

Date:  May 4, 2011

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE